**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:16-cv-22349-KMM

GILBERT ARMAND SADOUN,

      Petitioner,

v.

LARA GUIGUI,

      Respondent.

_____/

## MEMORANDUM OPINION AND ORDER

THIS CAUSE came before the Court upon Petitioner, Gilbert Armand Sadoun's ("Petitioner") Verified Petition for Return of the Parties' Minor Children to France, which was filed on June 21, 2016. *See* Pet. (ECF No. 1) (the "Petition"). Petitioner seeks the return of his three minor children to France pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980) (the "Convention"), to which both the United States and France are signatories. The Convention has been implemented in the United States through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.* Petitioner contends that Respondent, Lara Guigui ("Respondent"), has retained the parties' minor children in the United States without his consent since approximately August 2015.

Respondent filed an Answer and Affirmative Defenses to the Petition on July 12, 2016. *See* (ECF No. 17). The Court held a preliminary status conference with the parties on July 14,

2016 wherein the Court granted Respondent's Motion to Appoint Guardian Ad Litem[1] (ECF No. 18) by way of verbal and written order. *See* (ECF Nos. 23, 27). After ordering expedited pretrial proceedings, the Court conducted a bench trial on August 1, 2016.[2] (ECF No. 27). Respondent testified and called three other witnesses during her case-in-chief: L.L.S. (the parties' sixteen-year-old daughter), Danylle Ross (Respondent's close friend), and Muriel Guigui (Respondent's sister). Petitioner testified on his behalf and also called three witnesses during the presentation of his case: Maurice Guigui (the parties' first cousin), Ledicia Sadoun (Petitioner's eldest sister), and Laurence Sadoun (Petitioner's sister).

After due consideration and upon review of the Petition, testimony, the Guardian Ad Litem's Report (the "Report") (ECF No. 31), exhibits, briefing, and counsels' arguments, the Court now enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such. For the reasons set forth below, the Petition (ECF No. 1) is DENIED.

## I.   FINDINGS OF FACT

Based upon the evidence and credible testimony adduced at trial, the Court makes the following findings of fact:

Petitioner and Respondent were first married at a religious ceremony in Montreal,

---

[1]  The Court appointed Anne Bloom, Esq., as Guardian Ad Litem for the children subject to the Petition. *See* (ECF No. 27). In the order, the Court informed Ms. Bloom that it was her "role to objectively ensure that the children are represented within the parameters of the Hague Convention and to communicate their wishes to the Court." *Id.* Given the expedited nature of the proceedings, the Court is satisfied that Ms. Bloom adequately represented the children's interests through her sworn testimony at trial and her submission of the Report.

[2]  Petitioner and Respondent also submitted Proposed Findings of Fact and Conclusions of Law. *See* (ECF Nos. 42, 43).

Quebec on January 5, 1997.  They were later married in a civil ceremony on October 15, 1998 in Paris, France.  Petitioner is a French citizen, and Respondent is a dual citizen of the United States and Canada.  The parties' minor children that are the subject of the Petition (the "Children") are: S.A.E.S., born in 2001, L.E.J.S., born in 2004, and S.L.J.S., born in 2008.[3]  The parties' eldest daughter, L.L.S., turned sixteen following her removal to Miami, and thus is not subject to the Convention.  The Children were born in Paris and resided there with their parents in the family's apartment for most of their lives.  The Children are dual citizens of France and the United States.

Petitioner is a radiologist and owns his own solo radiology practice in Paris.  For the past seventeen years, Respondent was a housewife and stay-at-home mother, taking care of the Children and marital home while Petitioner maintained his medical practice.  Petitioner provided the only source of financial support for the family.

Over the past several years, the parties vacationed with their children in Miami Beach during the Children's summer vacation from school.  On June 29, 2015, Respondent and the parties' four children departed France for the family's annual trip to their vacation home in Miami Beach, Florida.  Although Petitioner normally joined the family on vacation for a few weeks, during the 2015 vacation he remained behind in France to attend to his ailing father.  Respondent and the Children were scheduled to return to Paris on August 26, 2015.  However, on that date, Respondent chose instead to remain in Miami with the Children at the parties' jointly owned vacation home.  When his family did not return to Paris as planned, Petitioner contacted Respondent on several occasions requesting that she return the Children to France so that they could continue their schooling without interruption.

---

[3]   Pursuant to Federal Rule of Civil Procedure 5.2(a), the children's initials are used in lieu of their full names and only their years of birth are stated.

At some point in September 2015, Petitioner visited his family in Miami Beach for approximately three days. He returned to Miami again for a five-day visit with the Children in November 2015. Shortly after returning to Paris following the November visit, Petitioner sent a request for the return of the Children to the French Central Authority (the "Central Authority"). *See* Pet'r's Ex. I (ECF No. 1-11). On November 25, 2015, Petitioner filed for divorce in Paris. On December 13, 2015, Petitioner sent a letter requesting a voluntary return of the Children through the United States Central Authority ("USCA"). Pet'r's Ex. J (ECF No. 1-12). On December 28, 2015, the USCA received a Hague Convention application from the French Central Authority.[4]

Petitioner returned to visit the Children during a three-night visit in February 2016, but he only had limited contact with them. Petitioner's subsequent visit in June 2016 resulted in an even more circumscribed visit with the Children. During this visit, Respondent—through a process server—attempted to effectuate service of process on Petitioner for their Florida state court marital dissolution proceeding. Since remaining in Miami, Respondent has obtained full time employment as a pharmacist and enrolled all four children in local Miami-Dade schools. Currently, the marital relationship of the parties has not been terminated and there are no custody orders in place establishing either parent as the legal or physical custodial parent.

At trial, the parties painted vastly different pictures of their relationship, not only with each other, but also with the Children. To the extent the testimony is relevant to this Court's inquiry under the Hague Convention, the Court resolves the credibility issues between Petitioner and Respondent on those material issues as discussed below.

---

[4] On May 12, 2016, the USCA finally confirmed the location of Respondent and the Children. Respondent's attorney then emailed the USCA on May 24, 2016, to state that he had been retained by Respondent and would serve as the point of contact for any further communications in this matter.

## II.     CONCLUSIONS OF LAW

### A.     <u>The Hague Convention and ICARA</u>

"To address 'the problem of international child abductions during domestic disputes,' in 1980 the Hague Conference on Private International Law adopted the [Hague Convention]." *Lozano v. Montoya Alvarez*, —— U.S. ——, 134 S. Ct. 1224, 1228 (2014) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)).  Subsequently, Congress "implemented the Convention's terms through the International Child Abduction Remedies Act of 1988 ('ICARA'), 22 U.S.C. §§ 9001–9011." *Gomez v. Fuenmayor*, 812 F.3d 1005, 1010 (11th Cir. 2016).  The Convention is designed "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir. 2007) (quoting Convention, pmbl.).

"Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4); *see also Abbott*, 560 U.S. at 22 ("Return is not required if the abducting parent can establish that a Convention exception applies.").  However, even if an exception applies, "the Court has discretion to order the return of a child if return would further the aims of the Hague Convention." *Marquez v. Castillo*, 72 F. Supp. 3d 1280, 1284 (M.D. Fla. 2014) (citation omitted).  Certainly, any affirmative defenses or "exceptions," are to be construed narrowly. *Ermini v. Vittori*, 758 F.3d 153, 161 (2d Cir. 2014); *see also Gomez*, 812 F.3d at 1011 ("As the Convention's official commentary has noted, narrow interpretations of the exceptions are necessary to prevent them from swallowing the rule and rendering the Convention "'a dead letter.'") (quoting Elisa Perez–Vera, *Explanatory Report: Hague Conference on Private*

*International Law, in 3 Acts and Documents of the Fourteenth Session* 426 (1980) ("Perez–Vera Commentary"), ¶ 34).  Ultimately, ICARA's limited scope of inquiry mandates that courts must not "become mired in inquiries of who is the better parent or who occupies the nicer home." *Pacheco Mendoza v. Moreno Pascual*, No. CV 615-40, 2016 WL 320951, at *1 (S.D. Ga. Jan. 26, 2016); *see also Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) ("The court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle.") (citation omitted).

### B.   Discussion

As a threshold matter, the Court determined at the inception of the bench trial—and the parties stipulated on the record—that Petitioner met his burden of presenting a prima facie case of wrongful removal or retention under the Convention.  *See* Tr. 5:15–6:17 (ECF No. 59). Because the Court's finding was fully set forth on the record, it is unnecessary to repeat it here.

Accordingly, the Court now turns to whether Respondent has satisfied her burden of establishing an affirmative defense under the Convention.  In her answer to the Petition and at trial, Respondent asserted the following affirmative defenses: (1) that the return of the Children would expose them to a grave risk of physical or psychological harm or place them in an intolerable situation; and (2) that the Children object to returning to France and have reached an age and degree of maturity such that the Court should consider their views.  *See* Resp't Answer (ECF No. 17), Tr. (ECF 59).

As discussed in more detail below, the Court finds that: (1) Respondent has established by clear and convincing evidence that returning the Children to France would expose them to a "grave risk" of physical or psychological harm, and (2) that Respondent has proven by a preponderance of the evidence that S.A.E.S. and L.E.J.S. are of a sufficient age and maturity to

6

permit the Court to appropriately consider their objections to repatriation. The Court also considered the Children's objections—including S.L.J.S.'s—and whether they are settled in Miami as individual and non-conclusive factors in its broader "grave risk" analysis. Based upon a review of the evidentiary record, the Court finds that Respondent has satisfied the requirements of these Article 13 defenses as a matter of law and, thus, the Court denies the Petition.

      1.    <u>Grave Risk of Physical or Psychological Harm</u>

      To succeed on a "grave risk" defense, a respondent must prove by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b); 22 U.S.C. § 9003(e)(2)(A). "[T]he party seeking to establish the exception must 'show that the risk to the child is grave, not merely serious.'" *Gomez*, 812 F.3d at 1012 (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10494–01, 10510 (1986) ("State Dept. Commentary")).

      While the Convention is designed to discourage child abduction, it "does not pursue that goal at any cost." *Lozano*, 134 S. Ct. at 1235. Logically, "the Convention's purposes [would] not . . . be furthered by forcing the return of children who were the direct or indirect victims of domestic violence." *Simcox v. Simcox*, 511 F.3d 594, 604–05 (6th Cir. 2007) (quoting Merle H. Weiner, *Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 33 Colum. Human Rights L. Rev. 275, 352–53 (2002)); *see also Baran v. Beaty*, 526 F.3d 1340, 1348 (11th Cir. 2008) ("Although we are cognizant of the Convention's goal of quickly returning abducted children to their countries of habitual residence, the text of the Convention and the commentaries on it place a higher premium on children's safety than on their return."). Notably,

the Eleventh Circuit has determined that evidence of a parent's "violent temper and abuse of alcohol" is sufficient to support a conclusion that ordering a child's return under the Convention would expose that child to a grave risk of harm. *Baran*, 526 F.3d at 1346

Although Respondent's retention of the Children in Miami is wrongful, the Court finds she has met her burden of presenting clear and convincing evidence that there is a grave risk that returning the Children to France "would expose the [Children] to physical or psychological harm or otherwise place the [Children] in an intolerable situation." Hague Convention, art. 13(b).

At trial, the parties' eldest child, L.L.S., nervously testified that Petitioner drank alcohol every night, *see* Tr. 11:13–14, 12:2–7, and that Petitioner would "act more violent" as a result.[5] Tr. 12:24, 13:2–5 ("Q.  When you say 'violent,' what do you mean?  A.  That he would hit us for no reason.  Not for no reason but like if we did something a little bad, like not big or anything he would hit us.").  Her testimony also revealed that during Petitioner's drunken tirades, he would call each of the Children "dummy," tell them they were "really stupid," and refer to his wife as a "Bitch" or "slut," which shocked his daughter.  Tr. 13:21, 14:1–2, 14:19, 14:22.

Respondent's sister also testified to Petitioner's increasingly aggressive behavior while drinking and of the verbal onslaughts he unleashed upon his family during these alcohol-infused episodes.  Tr. 86:24–25 ("A.  He would either yell at the children if they were awake or yell at my sister.  Call her names, like bitch, whore, things like that."); Tr. 89:12–13 ("Q.  What types of names would he call the[ Children]?  A.  He would call them stupid, idiots.").

---

[5]  L.L.S. also testified that when Petitioner was not drinking "he was normal" and treated the children with respect.  *See* Tr. 12:16, 13:8.  Respondent confirmed the wide variance in Petitioner's behavior caused by his drinking.  Tr. 117:9–10 ("Q.  Did he act differently when he was drinking?  A.  Yeah.  He was—it's like having two people in the same house.  Dr. Jekyll and Mr. Hyde basically.").

During one of Petitioner's visits to see the Children in Miami after their removal from France, an argument erupted between Petitioner and Respondent where he began calling Respondent derogatory names in front of the Children, which caused the parties' youngest son to cry. Tr. 27:10–14, Tr. 143:8–11 ("He was already seated with a drink in his hands.  As we went on . . . the night he kept on drinking and his speech got slurred.  Very angry.  Very aggressive.  He called me a bitch many times in front of the children.").  According to Respondent, Petitioner's belittling of her and the Children was anything but an isolated event.  Tr. 115:18–116:3, Tr. 130:13–15 ("[Petitioner's] verbally abusive.  He just recently called me a prostitute in the middle of a wedding in Miami.  He is continuously demeaning me.  It was terrible.").

Petitioner offered diametrically different testimony about his drinking habits during the presentation of his case.  According to Petitioner, he has only been drunk twice in his life.[6]  Tr. 263:2–6 ("Q.  Doctor, have you ever been drunk in your lifetime?  A.  Twice.  Q.  And how do you know that you were drunk?   A.   Because I went to vomit.").   As to Petitioner's daily drinking routine, testimony was offered that such habitual drinking is an inveterate part of the French culture.  Tr. 225:17–20 ("A.  You know, in France--you know, do you know in France, maybe it's the bad habit, we used to drink one or two glasses of wine each dinner.  You know French is the country of the wine."), Tr. 263:15–17 ("Q.  Doctor, do you . . . during the week, during the regular week do you drink wine with your dinner?  A.  Every day two glasses.").

Petitioner and his supporting witnesses also attested to the important role alcohol plays in their various family religious observations.  Tr. 226:1–5 ("A.  He can drink some Jack Daniels also because. . . the tradition is for[sic] Shabbat to drink Jack Daniels."), Tr. 239:22–240:4 ("Q.  When [Petitioner] does drink, how much does he drink?  A.  Depends.  He drinks whiskey and

---

[6]   The parties' first cousin, Maurice Guigui, also testified that Petitioner was never too intoxicated to the point where Petitioner "lost control."  Tr. 208:16–22.

two glasses of wine, depends.  It's social.  When we have a reunion of family, sometimes two whiskeys."), Tr. 263:10–12 ("Q.  Doctor, normally, how much do you drink on Shabbat?  A.  On Shabbat when we are alone, I have one whiskey and then for Kiddush and after we go for the dinner, Shabbat dinner and I have two or three glasses of wine.").

Throughout the trial, the parties colloquially referred to one such religious observation as the "Montreal Incident."  On that trip, the entire family traveled to Montreal to celebrate S.A.E.S.'s bar mitzvah.  After the ceremony, the family went downstairs in the temple to enjoy a family dinner celebration during which alcohol was served.  Tr. 38:3–6.  According to the testimony of Respondent's sister and L.L.S., Petitioner appeared to be intoxicated that evening. Tr. 15:8–10 ("Q.  Had [Petitioner] been drinking at the time" of the Montreal incident?  A.  Yes, because it was a special occasion, it was the bar mitzvah of my brother, so he drank a lot")., Tr. 89:24 ("A.  He was heavily drinking.  He was definitely intoxicated.").  Other witnesses offered conflicting testimony regarding Petitioner's level of intoxication that night.  Tr. 241:15–19.

Later that evening, Petitioner and Respondent got into an argument over whether S.L.J.S. could spend the night at Petitioner's niece's house.  Various witnesses testified that Petitioner dragged S.L.J.S. to his niece's house while Respondent gave chase and attempted to retrieve her crying daughter.  Tr. 90:12–13, 90:20–24, 128:11–14.  Multiple witnesses also testified that Petitioner elbowed Respondent and pushed her down a small set of stairs.  Tr. 43:4–8, 128:20–25, 129:8–14.  Ultimately, S.L.J.S. spent the night at Petitioner's niece house and Respondent returned to her hotel room after discussing calling the police with her sister.  Tr. 91:17–23.

Despite its sobriquet, the Montreal Incident was not an isolated occasion of marital discord or a droll disagreement.  In fact, testimony at trial revealed more than sporadic name-calling or verbal spats between spouses in the milieu of a troubled marriage.  The Court received

a substantial amount of credible testimony that throughout the parties' seventeen-year marriage, Petitioner exhibited a pattern of coercive behavior towards Respondent that is widely recognized—and can only be categorized—as domestic violence.[7]  For example, Respondent's sister testified that Petitioner isolated Respondent by greatly restricting her ability to travel, unless it was with the parties' children.  Tr. 93:2294:3 ("A. . . . I wanted to take a trip with [Respondent] for a day to London.  Q.  And did it occur?  A.  No it did not.  Q.  Why not?  Because [Petitioner] threatened to call the police and say that she had abandoned her home if we left."), Tr. 100:9–10 ("A.  Yes.  And I said alone without her children he wouldn't allow her to travel.").

Petitioner also financially abused Respondent by restricting her access to the couple's shared financial resources in what appears to have been an effort to reduce her sense of autonomy.  Tr.  131:5–9, Tr. 138:11–13; *see also* V. Pualani Enos, *Prosecuting Battered Mothers: State Laws' Failure to Protect Battered Women and Abused Children*, 19 Harv. Women's L.J. 229, 246 (1996) ("Batterers sometimes try to control their partners by limiting the partner's access to joint income.").  Petitioner's psychological abuse[8] also went unbridled.

---

[7]  Margaret E. Johnson, *Redefining Harm, Reimagining Remedies, and Reclaiming Domestic Violence Law*, 42 U.C. Davis L. Rev. 1107, 1116 (2009) ("[D]omestic violence is defined as a pattern of behavior in a relationship by which the batterer attempts to control his victim through a variety of tactics . . . .  These tactics may include fear and intimidation, physical and/or sexual abuse, psychological and emotional abuse, destruction of property and pets, isolation and imprisonment, economic abuse, and rigid expectations of sex roles.").  Respondent also testified that on many occasions, Petitioner engaged in sexually coercive behavior towards her.  Tr. 137:8–24.

[8]  The Second Circuit has noted that when children witness "their father's abuse of their mother" that event is "so psychologically traumatic that to return the children to the country where the abuse occurred would re-traumatize them."  Roxanne Hoegger, *What If She Leaves? Domestic Violence Cases Under the Hague Convention and the Insufficiency of the Undertakings Remedy*, 18 Berkeley Women's L.J. 181, 188 (2003) (citing *Blondin*, 238 F.3d at 160, 166); *see also Danaipour v. McLarey*, 286 F.3d 1, 17 (1st Cir. 2002) (noting that "a risk of harm arising out of

11

Not surprisingly[9], Petitioner directed this pattern of abusive behavior toward his children in a physical manner as well.  During the course of the bench trial, Muriel Guigui testified that she witnessed instances of Petitioner's physical abuse of the Children—namely S.A.E.S. and L.E.J.S.—when Petitioner would pull the boys' ears and drag them to their rooms where he would repeatedly hit them to a point where they screamed out, "[p]lease stop, you're hurting me."  Tr. 88:22–23, Tr. 89:7–8.  On one occasion, Muriel entered the room after Petitioner left and found the boys crying with red marks on their bodies where Petitioner had struck them.  Tr. 98:11–12.  Respondent also convincingly recounted the brutal methods Petitioner frequently employed to "discipline" the children for talking loudly.  Tr. 123:1–4 ("A.  He would strike their legs mostly because they were in a protective position.  Their arms and legs with the belt.  And usually to the head, a lot of times in the head.  It's hard to show proof.").  The Court also received into evidence, without objection, an audio recording of the parties' two sons being viciously beaten by Petitioner while the boys unsuccessfully begged for mercy.  Resp't Ex. 22.

In her Report—and during her sworn testimony at trial—the Guardian Ad Litem also discussed several instances of physical abuse that the Children brought up during their individual interviews.  *See* (ECF No. 31) at 2 (noting that S.A.E.S. "described incidents in Paris of his father coming into the boys' room if they were talking in bed and hitting him with a belt. S.A.E.S. involuntarily motioned to a spot on his left leg, and he did this several times when the

_____

the return to a locale where abuse occurred is a factor that a district court may properly consider in its overall grave risk analysis").

[9] "Many courts have recognized not only the psychological effect of spousal abuse on children, but also the risks spousal abusers pose, physically and psychologically, to children." *Neumann v. Neumann*, No. 15-CV-11995, 2016 WL 2864969, at *12 (E.D. Mich. May 17, 2016); *see also Gomez*, 812 F.3d at 1014 ("Similarly, it requires no stretch of the imagination to conclude that serious, violent domestic abuse repeatedly directed at a parent can easily be turned against a child."); *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000) ("[C]redible social science literature establishes that serial spousal abusers are also likely to be child abusers.").

discussion would return to this, always gesturing to the same spot on the same leg"); *id.* at 3 ("L.E.J.S. motioned involuntarily to a certain spot on his left arm and said that his father would flick a belt at him hard, that it hurt, and that it left a red mark on his arm each time, each time motioning to the same spot on the same arm."); Tr. 181:23–182:5, 199:4–200:1.

Efforts by Petitioner's attorneys to paint his physical abuse of the Children as isolated instances of corporal castigation are specious claims that are belied by the overwhelming and uncontroverted record before the Court. To this point, the Court finds it quite telling that Petitioner did not contest any of the allegations of abuse when he testified on his own behalf at trial. Nor did any of Petitioner's witnesses affirmatively refute the instances of physical aggression brought out by the sworn testimony presented during Respondent's case-in-chief.[10]

Although the "Court cannot substitute its view of child rearing for those of parents in other countries," *Jaet v. Siso*, No. 08-81232CIV, 2009 WL 35270, at *8 (S.D. Fla. Jan. 5, 2009), no one could reasonably contend that when Petitioner viciously struck his sixteen-year-old daughter in the head and possibly rendered her unconscious—in front of his seven-year-old daughter no less—that action was anything short of child abuse.[11] *See* Tr. 123:25–124:4 ("A. I

---

[10]  Petitioner also submitted various affidavits from friends and family members attesting to his affection for his children, his lack of an alcohol problem, and the absence of any indicators of abusive behavior on his part. *See* (ECF Nos. 32–36). To the extent any of the pretrial evidence submitted on Petitioner's behalf was noncumulative, the Court assigned that evidence its appropriate weight. However, given the superiority of live testimony, the Court gave greater consideration to the sworn trial testimony when evaluating the credibility and reliability of the evidence presented. *See* 3 *William Blackstone, Commentaries* *373–74 (1768) (through live testimony "persons who are to decide upon the evidence have an opportunity of observing the quality, age, education, understanding, behavior, and inclinations of the witness"); *see also Broad. Music, Inc. v. Havana Madrid Rest. Corp.*, 175 F.2d 77, 80 (2d Cir. 1949) ("The liar's story may seem uncontradicted to one who merely reads it, yet it may be contradicted . . . by his manner . . . which cold print does not preserve.") (internal quotations omitted).

[11]  Other courts have found less egregious actions to be "abusive and excessive" when denying a Hague Convention petition due to Article 13(b)'s grave risk defense. *Di Giuseppe v. Di*

13

recall one incident right before leaving for Miami.  L[.L.S.] upset [Petitioner], I don't know how, he chased her to her room, hit her so hard on the head that she fell on the floor, I think she blacked out because she didn't know what happened."), Tr. 19:14–17 ("Q.  Now has your father ever hit you?  A.  Yes.  Q.  Where would he hit you?  A.  On the body or sometimes rarely on the head.").  Respondent testified that this incident was the peak of Petitioner's violent behavior towards the Children and the impetus for her decision to remain in Miami with them.  Tr. 124:9–10 ("Q.  Was that the most violent thing you had ever seen him do?  A.  That was the peak, the summer [of 2015] for me.  It was too much.").

Throughout the trial, Petitioner's counsel made a concerted effort to challenge the testimony alleging Petitioner's physical abuse of the Children and his wife based on the fact that: (1) the police were never called during any of the alleged incidents of abuse; (2) no one ever went to the hospital; (3) no one ever had any broken bones; and (4) no medical attention was ever sought on behalf of the Children or the Respondent.  Tr. 47:12–48:7, 73:16–24, 98:13–23, 103:10–21.  This line of questioning—while designed to diminish the overwhelming weight of the testimony of abuse—merely emphasizes Petitioner's lamentable lack of accountability and counsel's strategy to shift blame to those harmed by Petitioner's abhorrent actions.[12]

---

*Giuseppe*, No. 07-CV-15240, 2008 WL 1743079, at *6 (E.D. Mich. Apr. 11, 2008) (finding petitioner's use of "corporal punishment" to be "abusive and excessive" where petitioner spanked her children two to three times a month and struck them across the face hard enough to leave marks); *see also Baran*, 526 F.3d at 1352 (affirming district court's finding of grave risk due to credible evidence that the father is "a violent and abusive man with a lengthy history of inflicting physical and psychological abuse on those he ostensibly loves the most.  His volatile personality, his propensity for alcohol abuse and his frequent statements of thinly veiled hatred for" his son and wife "combine to produce a highly combustible powder keg from which this Court is powerless to protect" the child).

[12]  Petitioner used the same misguided strategy of deflection when testimony surrounding the various instances of Petitioner's drunk driving—while his children were in the car—was brought out during the trial.

After all, courts frequently recognize that "victims of spousal abuse often do not come forward to report instances of domestic violence for many reasons and, therefore, a lack of near-contemporaneous documentation does not necessarily render a victim's claims unbelievable." *Souratgar v. Fair*, No. 12 CIV. 7797 PKC, 2012 WL 6700214, at *7 (S.D.N.Y. Dec. 26, 2012), *aff'd sub nom. Souratgar v. Lee*, 720 F.3d 96 (2d Cir. 2013); *see also Van De Sande v. Van De Sande*, 431 F.3d 567, 571 (7th Cir. 2005) (reasoning that due to "parental control of children, most abuse of children by a parent goes undetected"). "At an evidentiary level, there rarely is corroborating evidence because domestic violence usually occurs inside the home—it is the word of the victim against that of the abuser." Naomi R. Cahn, *Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions*, 44 Vand. L. Rev. 1041, 1082 (1991).

In the following passage, Professor Huntington aptly captures the internal incongruities that arise when one juxtaposes the social image a family advances with the hidden nature of familial domestic violence:

> Legal valorization of familial performances and the emphasis on what others see contributes to a cognitive dissonance about what is largely unseen. From everyday disagreements to the violence and sexual assault that mark too many families, what goes on behind closed doors is not what is seen at the playground and the grocery store. When the audience does stumble into the back, the scene can be startling.

Clare Huntington, *Staging the Family*, 88 N.Y.U. L. Rev. 589, 633 (2013). Petitioner's reliance on videos and photos of various occasions with his children to showcase the affectionate relationship they purportedly maintain is illustrative of this "cognitive dissonance surrounding family dysfunction." *Id.* at 634. Regrettably, the evidentiary record pulled back the curtain to reveal Petitioner's various acts of abuse against Respondent and his children.

What Petitioner ultimately fails to grasp is that "a father who torments, threatens, and abuses his partner is the source of, and thus is responsible for, the harm to his children." V.

15

Pualani Enos, *Prosecuting Battered Mothers: State Laws' Failure to Protect Battered Women and Abused Children*, 19 Harv. Women's L.J. 229, 236 (1996).  Scholars note that given the direct and indirect effects domestic violence has on children, "the decision to abduct children from their country of habitual residence is [likely] a reasonable course of action.  Indeed, for those abused, international child abduction may be viewed as necessary for survival."  Jeanine Lewis, *Hague Convention on the Civil Aspects of International Child Abduction: When Domestic Violence and Child Abuse Impact the Goal of Comity*, 13 Transnat'l Law. 391, 398 (2000); *see also* Merle H. Weiner, *International Child Abduction and the Escape from Domestic Violence*, 69 Fordham L. Rev. 593, 624–25 (2000) ("[E]ven assuming a country provides adequate legal protection for domestic violence victims and their children, a victim may reasonably believe that departing the country is the only way that she can ensure her safety.").

　　Respondent's credible testimony that Petitioner harmed S.A.E.S and L.E.J.S. as a result of the disproportionate force that Petitioner frequently inflicted on them with either a belt or his hands—whether closed or open—together with Respondent's unrefuted testimony about Petitioner's emotional torment and physical abuse of her and L.L.S.[13], "demonstrates a non-negligible probability of [Petitioner] someday physically injuring" the Children.  *See e.g.*, *Hernandez v. Cardoso*, No. 15-CV-11460, 2016 WL 3742858, at *2–3 (N.D. Ill. July 13, 2016) (holding that the "grave risk of harm exception" applied where respondent and minor child's

---

[13]　L.L.S.'s testimony was invaluable to the Court especially when one considers that as with most cases involving allegations of child abuse, it is not easy for a child to testify against a parent, particularly when there is the possibility that the parent may lose their rights of access to the child.  The Court is mindful that L.L.S.'s articulation of her desire to remain in Miami—although not relevant for purposes of the limited inquiry the Court must perform pursuant to the Convention—is partially based on her indubitable fear of her father. Tr. 20:8–12 ("Q.  And when you say more safe, do you mean from the streets?  Do you mean from your father?  Do you mean from somebody else?  What are you referring to?  A.  Well, from the streets with all what's happening in France, and my father."), Tr. 20:22–23 ("Q.  Are you sometimes afraid of your father?  A.  Yes.").

testimony "provide[d] clear and convincing evidence that there is a grave risk of physical or psychological harm to" the minor child if he is forced to return to petitioner's custody).

Notably, the Eleventh Circuit has found the standard for the grave risk exception met "where the father had verbally and physically abused the mother in the child's presence, and threatened to harm the child, but did not physically abuse the child." *Baran*, 526 F.3d at 1326. Meanwhile, the Sixth Circuit has found "grave risk" in a factually analogous case. *See Simcox*, 511 F.3d at 608-09 (determining that a "grave risk of harm" was established where physical abuse by petitioner involved "repeated beatings, hair pulling, ear pulling, and belt-whipping" and petitioner's psychological abuse consisted of "profane outbursts and abuse of the children's mother in their presence").

Petitioner's physical abuse of his children, the overwhelming evidence of psychological abuse of the Children and Respondent—particularly when Petitioner hurls obscene epithets at her in their presence—other indicia of domestic violence, and Petitioner's reckless disregard for his family's safety when he drives while intoxicated, leads the Court to an obvious conclusion: "[I]t would be irresponsible to think the risk to the children less than grave." *Van De Sande*, 431 F.3d at 570. Thus, Respondent has established through clear and convincing evidence that returning the Children to France would expose them to a grave risk of physical or psychological harm.

2.   Children's Objection—the Age and Maturity Exception

"The drafters of the Convention sought to deter wrongful removals, but they also recognized that wrongfully removed children are not inanimate objects—they are people with agency of their own." *Rodriguez v. Yanez*, 817 F.3d 466, 475 (5th Cir. 2016). Thus, Article 13 of the Hague Convention provides—in an unnumbered paragraph—that the Court "may also refuse to order the return of the child if it finds that the child objects to being returned and has

attained an age and degree of maturity at which it is appropriate to take account of [his] views." Convention, art. 13.  The text of the Convention restricts the age and maturity exception to cases in which the child actually states an objection, and not a mere preference against repatriation. *Rodriguez*, 817 F.3d at 476–77 ("Only an objection is sufficient to trump the Convention's strong presumption in favor of return.").  A respondent bears the burden to establish by a preponderance of the evidence that this exception applies.  *See* 22 U.S.C. § 9003(e)(2)(B); *see also In re K.J.*, No. 9:16-CV-80177-RLR, 2016 WL 874360, at *6 (S.D. Fla. Mar. 8, 2016).

The Hague Convention provides no specific age at which a child is deemed sufficiently mature such that his opinion must be considered.  *Tsai–Yi Yang v. Fu–Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007).  "Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate."  *de Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007).  "[I]f a court determines that the youngster's opinion is the product of undue influence, the child's wishes are not taken into account."  *Id.* at 1286; *see also Walker v. Walker*, 701 F.3d 1110, 1123 (7th Cir. 2012) (cautioning that "district court[s] must be attentive to the possibility that the children's views may be the product of 'undue influence' of the parent who currently has custody") (citation omitted).

When a child's "'wishes are the sole reason underlying a repatriation decision and not part of some broader analysis,' such as whether the child would suffer a grave risk of harm if returned to his or habitual residence," courts must apply a stricter standard."  *Tsai–Yi Yang*, 499 F.3d at 278–79 (quoting *de Silva*, 481 F.3d at 1286); *see also Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001) ("[A] court may consider a younger child's testimony as part of a broader analysis under Article 13(b)" of the Convention).

With these considerations in mind, the Court finds that Respondent has proven by a

18

preponderance of the evidence that S.A.E.S. and L.E.J.S. object to returning to France and that they have reached an age and degree of maturity such that it appropriate for the Court consider their particularized views against repatriation.   Moreover, when considered in the broader analysis the Court employed under Article 13(b) to determine that a "grave risk" faces the Children should they be returned to France, the overwhelming weight of evidence supports their remaining in the United States.

First, the Court finds both S.A.E.S and L.E.J.S (ages 14 and 12) sufficiently mature for the Court to take their views against repatriation into account.[14]   Based on her individual interviews with the boys, the Guardian Ad Litem noted that each child exhibited a depth and breadth of conversation that belied their age.[15]   See (ECF No. 31) at 2–4; see also Neumann, 2016 WL 2864969, at *8 (noting that "depth and thoughtfulness . . . are the hallmark[s] of a

---

[14]   The evidentiary record is devoid of any testimony regarding circumstances or events which would lead to a conclusion that S.A.E.S. and L.E.J.S. are immature for their age.  Quite frankly, the Court would be hard pressed to find the eldest son's age and maturity level insufficient for purposes of the Hague Convention.  See Vasconcelos v. Batista, 512 F. App'x 403, 405 (5th Cir. 2013) (deeming a thirteen-year-old child's objections to repatriation as being "consonant with that of other children whom courts have found to be of sufficient age and maturity for the purposes of this exception.").  S.A.E.S. will turn fifteen in October and thus only be one year away from aging out of the Convention's coverage.

[15]   When questioned on her method of using open-ended questions to interview the Children, the Guardian Ad Litem provided a prudent explanation for her approach:

> For one reason, and it is why I went in without preconceived or predetermined questions, I did not want to be putting words in their mouths either. . . . But by doing so, I was able to both get them to reveal to me their level of maturity by what they focused on and what they discussed and how they said it because, to me, it was equally as important, the words they used because if they all used the same words that would be more indicative of having been coached or told what they should say.  The fact that they gave completely different stories, with one exception, implied to me that they all were really telling me their versions of what happened and what was important to them.

Tr. 196:2, 196:16–24.

mature decision.").  Regarding S.A.E.S., the Guardian testified that he "emphatically stated" that he wanted to stay in Miami as he would "have a better professional life here."  *Id.* at 3; Tr. 190:16–20 ("When this kid said to me that he would have a better professional life here it's because he understands that the route to being a doctor or a lawyer or a CPA and all these other things are much easier to accomplish here than living in Paris, particularly in Paris as a Sephardic Jew.").

The Guardian Ad Litem also remarked that S.A.E.S. exhibited a degree of stoicism towards the possibility of remaining in Miami, which indicates a mature and objective understanding of his circumstances.  S.A.E.S.'s bravado-laced description of Petitioner's physical abuse of him and L.E.J.S. not only reflects a dissociative process that is a typical psychological defense for victims of trauma, but also serves as a latent indication of his objection to returning to France.  Tr. 182:2–5 ("A.  From various things he said, including the way his father would hit him and the way that he described it, I don't believe—I think those are his reasons not to want to return.  It's not my reasons.").

According to the Report, L.E.J.S. displayed a maturity beyond his years and thoughtfully expressed his earnest desire to stay in the United States.  *See* (ECF No. 31) at 4 ("[H]e stated very definitively that 'I don't want to go back at all.'").  When describing his father's alcohol usage, L.E.J.S. made several involuntary facial expressions during his interview that the Guardian Ad Litem found to be "heart-wrenching" and clear indicia of trauma.  *Id.*; Tr. 199:12–17 ("A.  With L[.E.J.S.], I saw significant evidence that he was traumatized by many of the things in the way that he responded to his life in Paris in the way that his eyes would flash in anger, the way that he would—the way that he exhibited a sneer of disgust in describing watching his father's drinking is not normal.").

The Guardian Ad Litem also testified that she believes S.L.J.S. is of sufficient maturity for the Court to consider her objection to repatriation.  Tr. 188:15–19 ("A.  I think she exhibits a lot of maturity in part because she's the youngest of four siblings, which makes her already, by definition, more mature in her outlook and based on her answers, which I was not prepared for the depth and quality and certainty of her answers, yes.").  The Report—and the Piagetian theory[16] of child development—moderately supports the Guardian Ad Litem's conclusion that S.L.J.S. has reached an age and maturity level where it is likely that her objection to repatriation is the product of a reasoned consideration of relevant facts.  *See* Susan D. Hawkins, *Protecting the Rights and Interests of Competent Minors in Litigated Medical Treatment Disputes*, 64 Fordham L. Rev. 2075, 2126 (1996) (noting that under Piaget's theory, children aged seven to eleven begin to understand causation and "gain a more objective view of the universe").

While it is arguable whether S.L.J.S. is of a sufficient maturity that her objection to repatriation should be taken under consideration, the Court endeavors not to create even more psychological turmoil for the Children by only ordering S.L.J.S.'s return to France.  In taking this position, the Court finds persuasive the reasoning of those courts that recognize that a "sibling relationship should be protected even if only one of the children can properly raise an affirmative defense under the Hague Convention."  *Ermini v. Vittori*, No. 12 CIV. 6100 LTS, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013), *aff'd as amended*, 758 F.3d 153 (2d Cir. 2014); *Blondin*, 78 F. Supp. 2d 283, 291 (S.D.N.Y. Jan.12, 2000) (declining to separate children because "children's relationships with their siblings are the type of intimate human relationships that are afforded a substantial measure of sanctuary from unjustified interference by the state")

---

[16]   Theories on the cognitive development of children are largely shaped by the works of Swiss psychologist Jean Piaget.  *See* Jean Piaget, *Judgment and Reasoning in the Child* (1928); Jean Piaget, *The Moral Judgment of the Child* (1932).

(quoting *Aristotle P. v. Johnson*, 721 F. Supp. 1002, 1005–06 (N.D. Ill. 1989)); *Broca v. Giron*, No. 11 CV 5818(SJ)(JMA), 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013) (deciding not to "further fracture the family unit" and separate the siblings).

Moreover, based on the Court's finding of a "grave risk" should the Children be returned to France—and the fact the Children are well-settled[17] away from the scene of the abuse they and their mother faced—S.L.J.S.'s generalized objection to returning to Paris clearly can be considered under the scope of the Court's broader analysis of the Hague Convention's Article 13 defenses. *See* (ECF 31) at 5. As to any possible contention that Respondent has unduly influenced the Children, their testimony merely reflects the realities of the Children's current situation.

For all the foregoing reasons, the Court declines to order the return of the Children to France even though the Court is empowered to do so.

### C.    Request for Fees and Costs

Both parties requested attorneys' fees and costs in their respective pleadings. But ICARA does not authorize a court to order a petitioner to pay a respondent's fees and costs if the court does not order return of the child. *See* 22 U.S.C. § 9007(b). Accordingly, because the Court is not ordering return of the Children to France, the parties will bear their own fees and costs incurred in this matter.

### D.    Conclusion

In sum, the Court finds that Respondent wrongfully retained the Children in Miami, Florida. However, given the clear and convincing evidence of both physical and psychological abuse, the Court finds that returning the Children to France would pose a grave risk to their

---

[17] Courts can properly consider whether children are "settled in their new environment as one factor in the Article 13(b) analysis." *Blondin*, 238 F.3d at 164.

physical and psychological well-being.  The Court also finds the Children are of a sufficient age and maturity that it is appropriate to consider their objections to repatriation, particularly when those objections are considered under a broader analytical scheme related to the "grave risk" facing the Children and the fact they are now settled in Florida.

To be clear, the Court is not deciding who is the better parent, nor is it concluding that Respondent is entitled to custody of the Children.  Those issues may be resolved in the appropriate forum at a later date.  On this occasion, the Court is merely deciding that the evidence presented warrants the denial of the Petition to return the Children to France. Unfortunately, the manner in which Petitioner presented his case leaves the Court with the impression that Petitioner's arrière-pensée is to gain a strategic advantage over his wife in their ongoing divorce proceedings rather than focusing on his children's well-being.[18]

For the foregoing reasons, it is ORDERED AND ADJUDGED the Petitioner's Verified Complaint and Petition for Return of Child (ECF No. 1) is DENIED.  The Clerk of Court is instructed to CLOSE this case.  All pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this  22nd  day of August, 2016.

K. M. Moore

K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE

c:      All counsel of record

---

[18]  A significant portion of the testimony developed by Petitioner at trial concerned issues that are irrelevant to the Court's limited inquiry under the Hague Convention regarding Respondent's affirmative defenses.  Counsel's focus on the parties' prenuptial agreement, intra-domestic financial concerns, and Respondent's alleged tax fraud combined with allegations of paramours and the Respondent's desire to live in Miami, did little to counter the overwhelming evidence of systematic psychological and physical abuse that Petitioner inflicted upon his family.